NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROSELYN LOMBARDI, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL SECURITY | : | Civil Action No. 08-CV-04061 (DMC) |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon Roselyn Lombardi's ("Plaintiff") appeal from the Commissioner of Social Security's ("Commissioner") final decision denying Plaintiff's request for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. For the reasons set forth below, the final decision of the Commissioner is **reversed**, and the matter is **remanded** for further proceedings consistent with this opinion.

## I.    FACTUAL BACKGROUND

Plaintiff was born August 14, 1967. T. 299. Plaintiff completed the eighth grade in school. T. 74. Until October 31, 2003, when Plaintiff learned she was pregnant, Plaintiff was medicated

with the following: Lexapro (20 mg) once per day, Trazadone (100 mg) at bedtime, Lorazapam (1 mg) twice per day, as needed, Genfibrozil (600 mg) twice per day, Altace (5 mg) once per day, Ranitidine (150 mg) twice per day, Nabumentone (750 mg) twice per day, Sulfazine (500 mg) twice per day, Tizanidine (4 mg) once per day, Allegra (60 mg) twice per day, Singulair (10 mg) once per day, Rhonocort Aqua (unknown) once per day, Albuteral Inhaler (unknown) twice per day, as needed, Advair (unknown) twice per day, as needed, Prednisone (5 mg) once per day and Albuterol Sulfate (2 mg) twice per day.  T. 256.  Currently, Plaintiff's medications include the following: Prednisone (5 mg) once per day, Lexapro (20 mg) once per day, Lorazepan (.5 mg) twice per day, as needed, Albuterol Inhaler (unknown) as needed, Vitafol (unknown) once per day, Promethazine (625  mg/5 ML) one teaspoon every 6 hours, Methyldopa 250 mg twice per day, Ketorolac (10 mg) three times per day, as needed, Folic Acid (800 mcg) once per day, Calcium (500 mg) twice per day and Flonase Nasal Spray (unknown) twice per day.  T. 257.

> A.    *Medical Records/Evaluations*

> 1.    Barbera Medical Report/West Hudson Hospital Medical Records

On June 20, 2003, Dr. Frank Barbera, M.D., the attending physician and a state medical examiner, found that a Peripheral Vascular Diagnostic Study revealed no evidence for Deep Vein Thrombosis ("DVT") of the bilateral extremities.  Dr. Barbera discovered a large Baker's cyst measuring 5.94 cm x 4.89 cm on the back of the right knee that was ruptured and leaking.

Dr. Frank Barbera's January 6, 2004 medical report documented Plaintiff's status as post carpal tunnel and identified a history of peptic ulcer disease. T. 325. Dr. Barbera indicated that Plaintiff was in no acute distress.  An x-ray of her right knee was unremarkable and a doppler

2

examination of the left leg was negative for DVT.  Id.   The extremities did not suggest edema. Her joints were stable except for a poplar cyst in the right knee. Id.

                2.       Easton Hospital Medical Records

On August 9, 2003, Plaintiff went to the Emergency Care Unit complaining of chest pain, weakness and numbness.  T. 321.   Plaintiff was diagnosed with an anxiety attack and discharged the same day.  T. 321.

                3.       Catholic Community Services/Mount Carmel Guild Medical Records

On February 15, 2000, Dr. Ashini Neelgund, M.D., diagnosed Plaintiff with bipolar disorder, type I, generalized anxiety disorder and ruled out schizoaffective disorder.  T. 295.   The record identified a 5 year history of mood disorder with no psychiatric hospitalization, but indicated that Plaintiff has a history of self-mutilation. T. 294.  The record also indicated that Plaintiff "had made vague suicidal attempts." Id.  Dr. Neeglund found that Plaintiff was of average intelligence and capable of managing her finances; her fund of knowledge was adequate; and her recent as well as her remote memory were intact.  T. 295.

                4.       Zincone Medical Synopsis

At the request of Dr. Amrita Sharma, Dr. John Zincone, M.D., Plaintiff's former psychiatrist, summarized his treatment of Plaintiff from January 12, 2004 through June 25, 2004, nine consultations in total. T. 397.  Dr. Zincone's supervisor, Cheryl Kennedy, M.D. was also a signatory to this treatment summary.  T. 400.   Over the course of treatment, Plaintiff reported episodic symptoms, decrease in sleep, decrease in appetite frequent headaches, poor concentration, irritability, and low mood, all catalyzed by stressful encounters in her life.  Id.  Plaintiff also reported increased

heart rate, shortness of breath, chest pain and a feeling of impending doom.  Plaintiff reported periods of elated mood and extremely irritable mood, racing thoughts, increased production of speech and increased goal directed activity lasting more than two days.  Id.  Plaintiff denied symptoms of mania, psychosis, obsessive compulsive disorder, eating disorder as well as suicidal/homicidal ideation or plan.  Id.  No delusion or paranoia was noted.  T. 399.  "Cognitively speaking she was alert and oriented to person/place and time, her insight and judgment were fair, and she showed good impulse control."  Id.

Plaintiff indicated that she was sexually abused by her brother from the age of 13 to 15.  At age 15, she received inpatient (residential) treatment at the Woodsbridge Child Diagnostic Center.  Aside from the inpatient treatment as a minor, Plaintiff denied psychiatric hospitalization.  T. 295.

The record documented a history of mood disorder over the past 5 years.  T. 294.  The Plaintiff had also engaged in self-mutilation and "had made vague suicidal attempts."  Id.  The record also documented a history of hyperprolactinemia, bronchitis, herniated discs and breast reduction surgery.  T. 294-95.

Dr. Zincone's mental status report on January 12, 2004, found no psychomotor agitation or retardation.  Dr. Zincone diagnosed Plaintiff with major depressive disorder, moderate without psychosis, panic disorder, cocaine dependence in full remission, alcohol abuse in early full remission, ruled out post-traumatic stress disorder, and ruled out bipolar disorder II..  T. 399.

Plaintiff requested to be transferred to a female therapist.  Plaintiff was placed under the care of Dr. Amrita Sharma, M.D., resident physician.

5.    <u>Sharma Medical Synopsis</u>

A letter dated, June 9, 2005, from Dr. Sharma to Plaintiff memorialized Plaintiff's request

to discontinue treatment and requested that the attached synopsis recounting treatment be forwarded

to Plaintiff's primary care physician, Dr. Viviane Ackad, M.D., upon submission of a release of

information request form. T. 382. The synopsis, signed by Dr. Sharma and Dr. Kevin O'Connor,

M.D., attending physician, indicated that Plaintiff was a patient with the outpatient psychiatry clinic

at UMDNJ since December, 2002 for treatment of mood and anxiety symptoms. Plaintiff was under

the care of Dr. Sharma from July, 2004 until the beginning of May, 2005. T. 383.

Dr. Sharma reported that Plaintiff's symptoms included depression, social anxiety and panic

attacks, all of which were exacerbated with stress. <u>Id</u>. Plaintiff also reported periods of irritability,

high energy, pressured speech, mild paranoid thoughts and difficulty sleeping. <u>Id</u>. Dr. Sharma

indicated that Plaintiff had no history of psychiatric hospitalization and that Plaintiff denied suicide

attempts, hallucinations and homicidal thoughts. <u>Id</u>.

Plaintiff reported a familial psychiatric history of bipolar disorder and schizophrenia as well

as substance abuse. T. 384. Plaintiff also reported a personal history of post-partum depression,

panic attacks and personal substance abuse, now in remission. <u>Id</u>.

Dr. Sharma diagnosed Plaintiff with probable bipolar II disorder, major depressive Disorder,

recurrent, mild panic disorder without agoraphobia, borderline personality disorder, a history of

bilateral carpal tunnel disorder, asthma, chronic bronchitis, herniated disk, a history of pituitary gland

abnormality causing hyperprolactinemia and headaches, arthritis and irritable bowel disease.. T.

385. Dr. Sharma indicated that Plaintiff reports mood stability, less depression, less anxiousness and

5

irritability, denial of anhedonia, better sleep, and fair energy.  Id.   Dr, Sharma suggested that the patient requires ongoing medication management and psychotherapy.  Id.

### 6. Hudgins Medical Report

On June 30, 2005, Plaintiff was seen by her pulmonary disease physician, Dr. Joan Hudgins, M.D.  T. 388.  Plaintiff was suffering a severe breathing condition requiring her to remain primarily inside the home.  Dr. Hudgins cautioned Plaintiff to avoid prolonged exposure to heat or high humidity. Id.

### 7. Figurelli Psychological Evaluation

At the request of the State of New Jersey Division of Disability Determination, Dr. Jennifer C. Figurelli, Ph.D., conducted a mental evaluation of Plaintiff on March 3, 2004.  Dr. Figurelli diagnosed Plaintiff with bipolar I, generalized anxiety disorder and schizoaffective disorder. T. 350.  Notably, her evaluation documented Plaintiff as unable to name the current president or recall the previous president, but able to recount and understand the events of September 11, 2001. T. 349.  Plaintiff reports overhearing people say, "you're no good" and "you're lazy." T. 350.  The report indicated that in the morning Plaintiff would prepare her child for school, would prepare herself for doctors' appointments, would prepare meals, would check her accounts on the computer and at times, got into a "cleaning sprint." T. 348-49.  However, other times, Plaintiff slept all day or watched t.v.  Although Plaintiff reported going to bed early, she would wake up on an hourly basis. T. 349.  Plaintiff indicated that she found herself unable to go anywhere alone, requiring her husband to accompany most places, such as shopping.  T. 349.  Plaintiff used to eat a lot, but reported a loss in appetite.  Plaintiff also  reported a history of suicidal thoughts.  T. 350.

8.      Galakos Physical Residual Function Consultation

On March 10, 2004, Dr. W. P. Galakos, M.D., state medical examiner, performed a consultation and determined that Plaintiff could occasionally lift 20 pounds, regularly lift 10 pounds, stand or walk 6 hours in a workday, sit with normal breaks for a total of 6 hours in a workday and with adherence to the foregoing restriction, appeared unlimited in terms of the ability to push and pull. T. 333.   The report indicated that Plaintiff had a limited functional ability.  T. 337.

9.      Nobel Psychiatric Review Technique and Mental Residual Functional Assessment

On March 25, 2004, Dr. C. Richard Nobel, PSY. D., state medical examiner, assessed the Plaintiff. Pursuant to section 12.04 and 12.09 of the review, Dr. Nobel found that Plaintiff suffered a medically determinable impairment present that does not satisfy the diagnostic criteria listed above, respectively schizoaffective disorder and polysubstance abuse.  T. 355, 360.   In rating degree of limitation, Dr. Nobel found Plaintiff suffered a mild restriction concerning activities of daily living, a moderate restriction in regarding difficulties maintaining social functioning, a moderate restriction regarding difficulties in maintaining concentration, persistence and pace and insufficient evidence regarding episodes of decompensation. T. 362.

In rating Plaintiff's understanding and memory, Dr. Nobel found Plaintiff was not significantly limited with respect to the ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions and moderately limited with respect to the ability to remember detailed instructions.  T. 366. With respect to sustained concentration and persistence, the Plaintiff was found not significantly limited in terms of the ability

to carry out simple or detailed instructions.  There was a moderate limitation with respect to the ability to maintain attention and concentration for extended periods and with respect to the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances and with respect to the ability to complete a normal workday and workweek. T. 366.  In terms of social interaction, Plaintiff was found not significantly limited with respect to the ability to interact appropriately with the public, the ability to ask simple questions or request assistance and the ability to maintain socially appropriate behavior.  T. 367.  With regard to social interaction, Plaintiff was found moderately limited in terms of the ability to accept instructions and respond appropriately to criticism of supervisors as well as the ability to get along with co-workers or peers. Id. In terms of adaptation, Plaintiff was found moderately limited with respect to the ability to respond appropriately to changes in the work setting and the ability to travel in unfamiliar places or use public transportation.  Id.

The Functional Capacity assessment identified Plaintiff's credibility and reliability as questionable.  T. 368.  It documented Plaintiff as performing chores and handling finances.  Id. Additionally, the assessment concluded that "[Plaintiff] is capable of understanding instructions and maintaining pace and persistence in simple, routine, low contact work."  Id.

### 10.   Ackad Medical Records

An MRI of the lumbar spine without contrast, ordered by Dr. Ackad, Plaintiff's primary physician, on July 10, 2006, revealed that the L5-SI intervertebral disc is minimally diminished in signal encroachment of the spinal canal.  T. 286.  Also, a thin, central intervertebral disc bulge was present without encroachment of the spinal canal.

8

B.      *Vocational History*

From May, 1996 until March, 1999, Plaintiff worked for Ram Products as a P.C. board electronic assemblywoman and served intermittently as a banquet waitress at different locations. T. 275.  From March, 1998 until July, 1999, Plaintiff worked for Healthlyn Corp. as a P.C. board electronic assemblywoman.  Id.  From August, 1999 until June, 2000, Plaintiff worked for Creative Tech. as a P.C. electronic assemblywoman.  In 2001, Plaintiff worked at Shoprite.  Id.

C.      *Testimonial Record*

1.      Interrogatories

In reliance upon the dictionary and occupational title, the Occupational Outlook Handbook and selected characteristics of occupation, the vocational expert, Mr. Rocco Meola, employed by the Social Security Administration, found that the claimant was a younger individual within the meaning of the regulations who had limited education, extending through the 8th grade.  T. 277.  Mr. Meola identified Plaintiff's past relevant work as a waitress as light and unskilled.  Mr. Meola identified Plaintiff's past relevant work as an assemblywoman as light and semi-skilled.  Mr. Meola found that Plaintiff's previously acquired skills were not transferrable given the restriction posed in interrogatory hypothetical 11, however, he identified jobs within the national economy Plaintiff could perform, including garment sorter, sealing machine operator, scaling machine operator and label machine operator[1].  T. 278.  Mr. Meola found that Plaintiff could not perform her previous

---

[1]The hypothetical question posed by the ALJ said, "Assume an individual of the claimant's age, education and work history.  Assume further that this individual is restricted to light work, must avoid jobs involving continual and repetitive fine fingering manipulations and must avoid a job involving contact with the public and had only minimal contact with supervisors.  With those limitations are there jobs available that such a person can perform in the local or national economy."

work because that job involved dealing with people and fine fingering.  Id.

        2.    <u>Original Hearing</u>

Plaintiff indicated that she suffered from bipolar disorder, severe anxiety and paranoia.  T. 53.  Plaintiff explained that her medications caused drowsiness and irritability. T. 54. Plaintiff explained that she lives with her husband and two children.  Id.  Plaintiff testified she did not socialize because it aggravated her paranoia and severe anxiety resulting in panic attacks.  T. 85. Plaintiff testified that her husband was on disability and needed a double knee replacement.  T. 55. Plaintiff also testified that her husband worked approximately four hours a day as a security guard. T. 80.  Plaintiff indicated that she spent her day playing with the baby, watching television and sleeping. T. 55.  At times, Plaintiff would get a burst of energy and would find herself darting around which, she had been told, was a consequence of her bipolar disorder.  T. 83.  She also said that her husband performed most chores, such as vacuuming and dusting and helped her cook.  T. 55. Plaintiff explained that she only cooked once in a while, did dishes sometimes and played with the kids.  T. 63.  Plaintiff revealed that her husband raised the children.  Id.

Plaintiff indicated that she suffered from carpal tunnel syndrome which was exacerbated by damp weather. T. 56.  Her symptoms included dropping things, hands freezing up and numbness. Id.  Plaintiff contended that a recent EMG study performed revealed permanent muscle damage to her hands.  Id. Plaintiff indicated that she had been diagnosed with lumbar disc disease.  T. 57. Plaintiff revealed that she had been on a waiting list at University Hospital for pain management. Id. Plaintiff indicated that she also suffered from rheumatoid arthritis.

Plaintiff disclosed that she lost her license. T. 58.  Her psychiatrist refused to submit forms

on her behalf because he was afraid that her medications compromised her ability to drive.  Id. Plaintiff's explained that her husband drove her to her doctors' appointments, took her food shopping and ran to the pharmacy for her on a regular basis.  T. 60.

When questioned about working a 6 hour workday, Plaintiff indicated that she was unable to work as a consequence of her psychiatric conditions. T. 77.  She claimed she was unable to concentrate; under pressure she would freeze up; she suffered anxiety attacks; and she would lose her temper easily.  T. 61.  Specifically, Plaintiff claimed she had problems getting along with a former boss's secretary who was also his wife, and, as a consequence, left the position.  Id.  Plaintiff explained that her psychiatric conditions started approximately ten years ago and have been exacerbated over time.  T. 77.  When Plaintiff felt stressed, she would get depressed and would cry a lot.  T. 79.  She indicated that she first felt suicidal approximately 6 months after the birth of her first child in 1995. T. 77. Throughout the last couple of years, Plaintiff was undergoing psychiatric treatment at least once a month and often, twice a month.  T. 79.  Additionally, Plaintiff testified that a problem with her wrists prevented her from performing her former job as a PC assemblywoman. T. 88.  She also claimed that she suffered from short term memory loss.  T. 87.

Plaintiff's most recent form of employment was assembling electronic PC boards. T. 74.  The aspect of her employment requiring her to put parts in the PC board enabled her to remain sedentary, but the aspect of her job requiring her to put the board through the soldering iron required her to stand.  Plaintiff testified that her job required her to lift a maximum of 20-25 pounds.  T. 75. Plaintiff testified that she terminated her position as a waitress because her carpal tunnel syndrome prevented her from lifting trays.  T. 76.

11

3.    <u>Supplemental Hearing</u>

Upon remand from the Social Security Administration Appeals Council ("Appeals Council"), a supplemental hearing was conducted for the purpose of cross-examination of the vocational expert pursuant to interrogatories submitted by him. T. 31. On cross-examination, Mr. Meola agreed that a moderate limitation of the abilities to maintain attention and concentration, perform activities within a schedule and maintain regular attendance within customary tolerances, accept instructions and respond appropriately to criticism as well as get along with coworkers or peers would create a negative effect on any job. Mr. Meola indicated that garment sorter, sealer and scaler jobs did not require fine fingering, but rather involved gross movements of the hands. T. 37. Mr. Meola defined moderate to mean "a person is able to perform the activity but not at a level that would be acceptable in the competitive labor market," a person functioning at 60-70% of capacity. T. 38.

## II.    PROCEDURAL BACKGROUND

Plaintiff applied for DIB on November 6, 2003, under Title II of the Act. The Commissioner denied the initial application and the reconsideration application. A timely request for a hearing was filed. On October 24, 2005, a hearing was held before Administrative Law Judge ("ALJ") Dennis O'Leary. In the decision dated November 28, 2005, the ALJ denied Plaintiff's request for DIB. Plaintiff requested a review of the ALJ's decision from the Appeals Council. The Appeals Council remanded this matter on May 13, 2006, and another hearing was held before the ALJ on September 26, 2007. A supplemental hearing was also held on May 7, 2007. Plaintiff's request for DIB was again denied, and Plaintiff sought Appeals Council review. Appeals Council review was denied on June 13, 2008, and Plaintiff timely sought appeal to this Court.

**III.** **S**TANDARD OF **R**EVIEW

    *A.  Statutory Standard for Disability Insurance Benefits*

A claimant's eligibility for Disability Insurance Benefits is governed by 42 U.S.C. § 423, and eligibility Social Security Income ("SSI") Benefits is governed by 42 U.S.C. § 1382.  In order to receive both DIB and SSI, a Plaintiff must be found "disabled."  The term "disability" has essentially the same definition for purposes of Title II and Title XVI of the Act and is defined as an:

> inability to engage in any substantial gainful activity by reasons of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . .

42 U.S.C. §§ 423(d)(1)(A) and 1383c(a)(3)(A).  A person is disabled only if her physical or mental impairments are "of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kinds of substantial gainful work which exists in the national economy."  See 42 U.S.C. §§ 423(d)(2)(A), 1383c(a)(3)(B).  A physical or mental impairment must result from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)©.

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  For the first two steps, the claimant must establish: step one, that she has not engaged in "substantial gainful activity" since the onset of the alleged disability; and step two, that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(a)–©.  Given that the claimant bears the burden of establishing

13

these first two requirements, her failure to meet this burden automatically results in a denial of benefits, and a court's inquiry necessarily ends there. Bowen v.Yuckert, 482 U.S. 137, 146–47 n.5 (1987) (delineating the burdens of proof necessary at each step of the disability determination).

If the claimant satisfies her initial burdens, the claim shifts to step three. In that step, the claimant must provide evidence that her impairment is equal to or exceeds one of the impairments listed in Appendix 1 of the regulations ("Listing of Impairments"). See 20 C.F.R. § 404.1520(d). Upon such a showing, claimant is presumed disabled and is automatically entitled to disability benefits. Id. If she cannot so demonstrate, the benefit eligibility analysis requires further scrutiny in step four.

Step four focuses on whether the claimant's residual functional capacity ("RFC") sufficiently permits her to resume her previous employment. See 20 C.F.R. § 404.1520(e). If the claimant is found capable of returning to her previous vocation, then she is not "disabled" and not entitled to disability benefits. Id. Should the claimant be unable to return to her previous work, the analysis proceeds to step five. Step five shifts the burden to the Commissioner to demonstrate that the claimant can perform other substantial, gainful work. See 20 C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant shall be determined disabled and receive social security benefits. Yuckert, 482 U.S. at 146–47 n.5.

### B.  Scope of Judicial Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert denied sub nom., Williams v. Shalala, 507 U.S. 924 (1993). "Substantial

14

evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197 229 (1938)). Rather, it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. Some types of evidence, however, that will not be "substantial," include:

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Sec'y of HEW, 714 F.2d 287, 290 (3d Cir. 1983). "Where the ALJ's findings of fact are supported by substantial evidence, the [reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001). Thus, substantial evidence may be slightly less than a preponderance. Stunkard v. Sec'y of Health & Human Services, 841 F.2d 57, 59 (3d Cir. 1988).

The reviewing court is required to review the entire administrative record. See 5 U.S.C. § 706; Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003). Moreover, the court has a "duty to review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)). In order to review the evidence, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the

15

[Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of HEW, 567 F.2d 258, 259 (4th Cir. 1977)).

"[The reviewing court] need[s] from the ALJ not only an expression of the evidence []he considered which supports the result, but also some indication of the evidence which was rejected." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  Without such an indication by the ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot determine whether the evidence was discredited or simply ignored.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter, 642 F.2d at 705); Walton v. Halter, 243 F.3d 703, 710 (3d Cir. 2001).  "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact finder." Williams, 970 F.2d at 1182 (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## IV.   DISCUSSION

     A.    *Plaintiff's claims that the ALJ erred at steps two and three*

       1.   Impairment 1.00

The ALJ's finding that Plaintiff has not engaged in substantial gainful activity since the alleged onset date, January 15, 2001, remains uncontested, however, Plaintiff argues that the ALJ erred at step three in failing to offer the reasoning for the conclusion that Plaintiff's allegations of carpal tunnel syndrome do not meet or equal the most analogous impairment listing. "If [a claimant's] impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal." 20 C.F.R. § 404.1562(b)(2). In the instant matter, the ALJ offers substantial evidence to support the finding that Plaintiff's impairments are not sufficient to meet the level of severity required by the relevant category most analogous to Plaintiff's carpal tunnel impairment, 1.00 - Musculoskeletal System. Indeed, the ALJ's decision indicates that Plaintiff's symptoms do not rise to level of severity required under 1.00 "because the evidence fails to establish nerve root compression, spinal arachnoiditis or lumbar spinal stenosis." Moreover the ALJ found that Plaintiff has lost neither "the ability to ambulate effectively as defined in 1.00B2B" nor the ability "to perform fine and gross movements effectively as defined in 1.00B2c." Notably, the inability to ambulate effectively has been recognized by this Court as a requirement for any musculoskeletal impairment. Morrison v. Comm'r of Soc. Sec., 2008 U.S. App. LEXIS 5308, *10 (3d Cir. Mar. 11, 2008).

While the Plaintiff's condition may meet some of the criteria under the 1.00 Listing, there is ample evidence in the record to support the ALJ's finding that Plaintiff's symptoms are insufficient

to satisfy the required level of severity.  The ALJ acknowledges the substantial deference afforded

the opinion of the Commissioner's medical expert and, also, notes an absence of sufficient evidence

to support a finding to the contrary.  Citing to Exhibits 8F and 11F, and indicating that the Plaintiff

cleans, cooks, shops, prepares her daughter for school, cares and plays with her children, uses the

computer for accounting purposes and conducts other household chores, the ALJ concludes that these

activities prove inconsistent with the level of severity required for total disability.  Dr. Barbera's

medical report indicates that Plaintiff's status is post carpal tunnel; and that although she suffers from

stiffness in the hands, there is no indication that Plaintiff's hands have lost the ability to function.

This evidence confirms the ALJ's determination that Plaintiff's carpal tunnel syndrome in

combination with Plaintiff's other impairments do not rise to the level of severity required under 1.00

listing.  Additionally, Plaintiff's argument fails to cite contrary evidence sufficient to warrant reversal

with regard to this finding.

### 2.    Impairment 12.04

Plaintiff contends that the ALJ erred in not addressing all of the elements in each subsection

for the impairment listing 12.04.  In support of this contention, Plaintiff argues that the record

evidences symptoms listed in subsection A of listing 12.04, including anhedonia, appetite disturbance,

sleep disturbance, decreased energy, feelings of guilt and difficulty concentrating.  Upon remand, the

ALJ found the following:

> listing 12.04 [has] not been met because the evidence fails to establish any functional
> limitations of the severity described in Subsections A, B, or C.  There is no evidence
> of psychomotor agitation or retardation, delusions or paranoia, or hallucinations.
> Great weight is afforded to the opinion of the Commissioner's medical expert(s) in
> this step of the sequential evaluation process in finding the listing requirements are not
> met.

In <u>Rivera v. Commissioner</u>, the court declared the following:

> It is not enough for the ALJ to conclude that no medical evidence meets or equals any of the listings, in the absence of any discussion of why the specific evidence provided by the claimant was not equivalent. However, in reviewing the voluminous medical evidence available to us, we found abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence. Therefore, we hold that here the ALJ's conclusory statement in step three was harmless.

164 Fed. Appx. 260, *4 (Jan. 31, 2006).  With regard to listing 12.04, the ALJ did not render a blanket conclusion, but rather supported his position by identifying the absence of objective medical evidence documenting the requisite characteristics required under the listing.

A subjective assessment is not credible if it is inconsistent with the objective medical evidence, claimant's own testimony or other evidence on the record.  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 362 (3d. Cir. 1999); <u>McQueen v. Comm'r of Soc. Sec.</u>, 322 Fed. Appx. 240, 245 (3d Cir. N.J. 2009).  Indeed, the ALJ addressed Plaintiff's subjective symptoms in determining that "claimant's subjective complaints of disabling pain and other symptoms and limitations precluding all significant work activity are not fully credible or consistent with Social Security Ruling (20 CFR 404.1529)."  Moreover, the ALJ found that the Plaintiff "does household chores, cooks, cleans, shops, prepares her daughter [for] school, takes care and plays with her children, and checks her accounts in the computer (Exhibits 8F and 11F)."

Contrary to the Plaintiff's assertion that her subjective symptoms support a finding of the required level of severity, in the absence of objective medical evidence supporting Plaintiff's subjective symptomatology and in light of the ALJ's determination that the Plaintiff is not credible, the record does not present objective medical evidence of anhedonia, appetite disturbance with change in weight or feelings decreased energy.  The ALJ's finding that Plaintiff's impairment is

inconsistent with the required level of severity is affirmed.

Further, Plaintiff claims that the ALJ erred at subsection B in failing to consider Plaintiff's symptoms as consistent with Manic Syndrome and at C in not considering Plaintiff's bipolar disorder. The record fails to present any objective medical evidence supporting Plaintiff's claim that her impairment is consistent with subsection B. Additionally, while Plaintiff has been diagnosed with some form of bipolar disorder, diagnosis alone is insufficient to meet the severity required under subsection C because that subsection requires demonstration of a higher threshold. That is, subsection C applies only if there is a presence of bipolar syndrome "with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." 20 C.F.R. Part 404, Subpart P, Appendix 1.

### 3.   Impairment 12.06

Plaintiff contends that the ALJ erred at steps two and three in failing to assess Plaintiff's anxiety disorder under the listed impairment in Appendix 1, 12.06 Anxiety Disorder. In Salles v. Commissioner, the court concluded that "[b]ecause the ALJ found in [claimant's] favor at step two, even if he had erroneously concluded that some of the other impairments were non-severe, any error was harmless." 229 Fed. Appx. 140, 145 n.2 (3d Cir. 2007); see Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005). Where an ALJ fails to discuss any of the listings whatsoever from among the listing of impairments, error may still be considered harmless so long as the ALJ's decision is supported by substantial evidence, and the discussion is sufficiently explanatory to permit meaningful review. Albury v. Comm'r of Soc. Sec., 2004 U.S. Spp. LEXIS 16187, *6 (3d Cir. 2004). By contrast, Burnett v. Commissioner demonstrates that an ALJ's pure conclusory statement

that a claimant's "impairment failed to equal the level of severity of [any of the listings]" proves insufficient to permit meaningful review of the record. Id. (220 F.3d 112 (3d Cir. 2000)). The instant matter is unique in that the ALJ's initial decision explicitly references impairment listings 12.04 and 12.06, finding "the evidence regarding claimant's mental impairment establishes that the claimant suffered from depression with the meaning of listing 12.04 and 12.06."  Although the record provides objective medical evidence supporting the presence of anxiety disorder and panic attacks, upon remand from the Appeals Council, the ALJ fails to offer any reason for discounting or rejecting such objective medical evidence and appears to disregard his earlier finding and instead to elect an analysis focusing on impairment listing 12.04.  Thus, the ALJ raises a question with regard to Plaintiff's impairments under 12.06, but subsequently fails to develop a record to discredit the severity or presence of such listing and appears rather to ignore that objective medical evidence the ALJ previously accepted to establish the original finding.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  This omission precludes meaningful review of the record and, therefore, requires remand of this matter for proceedings consistent with this opinion.

B.     The ALJ's determination of Plaintiff's Credibility

Plaintiff argues that the ALJ incorrectly found that the Plaintiff's subjective complaints were not fully credible.  Although an ALJ has an affirmative duty to consider Plaintiff's subjective complaints, such complaints can be found not credible if they are inconsistent with the objective medical evidence, claimant's own testimony or other evidence on the record.  Hartranft v. Apfel, 181 F.3d 358, 362 (3d. Cir. 1999); McQueen v. Comm'r of Soc. Sec., 322 Fed. Appx. 240, 245 (3d Cir. N.J. 2009).   The assessment of Plaintiff's credibility is within the discretion of the ALJ.  66 Fed. Appx. 297, 300 (3d Cir. 2003).

In the present case, the ALJ cites to Plaintiff's claim that she is incapacitated, warranting disability. The ALJ then contrasts Plaintiff's subjective interpretation with the fact that Plaintiff cooks, cleans, shops, prepares her children for school and uses the computer. Therefore, the ALJ's determination that the Plaintiff 's credibility is questionable will not be disturbed.

C.      *The ALJ's Determination of Plaintiff's Residual Functional Capacity at Step Five*

Although the ALJ's finding that the Plaintiff cannot resume her previous work remains undisputed, Plaintiff argues that the ALJ erred in determining Plaintiff's RFC at step five. Specifically, Plaintiff contends that the hypothetical presented to the vocational expert fails to incorporate all of Plaintiff's impairments. The disputed hypothetical question presented to the vocational expert in the interrogatories submitted by the ALJ recites:

> Assume an individual of the claimant's age, education and work history. Assume further that this individual is restricted to light work, must avoid jobs involving continual and repetitive fine fingering manipulations and must avoid a job involving contact with the public and had only minimal contact with supervisors. With those limitations are there jobs available that such a person can perform in the local or national economy.

"[W]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (quoting Podeworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). "A hypothetical question posed to a vocational expert must reflect all of the claimant's impairments." Id. (quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)). However, "all impairments" refers only to those impairments which have been medically established by the record. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d

Cir. 2005).  If an ALJ "poses a hypothetical question to a vocational expert that fails to reflect all of a claimant's impairments that are supported by the record[,] ... it cannot be considered substantial evidence." Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (quoting Chupracala v. Hector, 829 F.2d 1269, 1276 (3d Cir. 1987)).  "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence."   Burns, 312 F.3d at 123 (quoting Podeworny, 745 F.2d at 218  (internal citation omitted)).  The hypothetical question posed by the ALJ appears deficient in that it does not account for the Plaintiff's moderate deficiencies in concentration, persistence or pace.  See Ramirez, 372 F.3d at 555.[2]   The hypothetical must also account for documented limitations in regard to adaptation.  This case is remanded for proceedings consistent with the foregoing.

Notably, the ALJ's initial decision indicates that the claimant suffers from "moderate difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence and pace" and explicitly claiming that such conclusion is supported by the "great weight given to DDS examiners in Exhibits 6F, 9F and 10F."[3]  In his subsequent ruling, by contrast, the ALJ indicates that "no significant weight is accorded to the State Agency's assessment of "moderate" limitations in multiple areas of mental functioning (Exhibit 10F), indicating that "the record does not support such extensive limitations."  This inconsistency further precludes a meaningful review,

_____

[2] Hypothetical failing to account for claimant's deficiencies in concentration, persistence and pace is itself deficient, requiring remand.

[3] Exhibit 9F and 10F refer to the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, respectively, conducted Dr. Nobel.  Exhibit 6F refers to the Physical Residual Function Consultation conducted by Dr. Galakos.

and also requires remand, for development, of the record.

## IV.    CONCLUSION

For the reasons stated, the Court finds that the matter should be **remanded** for further

proceedings consistent with this opinion.  An appropriate Order accompanies this Opinion.


    S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:        September   29  , 2009
Orig.:        Clerk
cc:          All Counsel of Record
             File

24